Mario DIAZ; Maria Diaz, Plaintiffs–Appellants,

v.

UNITED AGRICULTURAL EMPLOYEE WELFARE BENEFIT PLAN AND TRUST; Associated Citrus Packers Employee Benefit Plan, Defendants–Appellees.

No. 93–56092.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 1995.

Decided March 27, 1995.

Sharon J. Arkin, Shernoff, Bidart & Darras, Claremont, CA, for plaintiffs-appellants.

Ronald J. Cooke, Littler, Mendelson, Fastiff, Tichy & Mathiason, Los Angeles, CA, for defendant-appellee United Agr.

Donald D. Wilson and Lisa M. Kralik, Grace, Skocypec, Cosgrove & Schirm, Los Angeles, CA, for defendant-appellee Associated Citrus.

* Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

Before: BRUNETTI and KOZINSKI, Circuit Judges, and SHADUR,* Senior District Judge.

SHADUR, Senior District Judge.

Mario Diaz ("Mario") and his wife Maria (collectively "Diazes") sue United Agricultural Employee Welfare Benefit Plan and Trust (the "Plan") and Associated Citrus Packers ("Associated") for medical benefits assertedly owed to Diazes under the Plan, an employee welfare benefit plan subject to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, and to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. §§ 1161–1169.[1] Associated and the Plan sought and obtained summary judgment under Fed.R.Civ.Proc. ("Rule") 56 on grounds stemming from Diazes' failure to exhaust the Plan's internal administrative remedies. We affirm.

### Background

Mario was employed by Associated as an agricultural worker during the late 1980's and early 1990's. On June 1, 1990 Associated switched health care providers and began offering coverage to its employees and their families through the Plan. Employees were given the option of electing single coverage for themselves alone or family coverage for themselves and eligible dependents. Associated paid the cost of employee coverage, while employees were responsible for the cost of dependent coverage via deductions from their pay checks.

Like many Associated employees, Mario neither speaks nor reads English. After Mario received a 45–page Summary Plan Description dated June 1, 1990 that explained the Plan's terms in both English and Spanish, Mario read portions of the Summary Plan Description in Spanish. In part the document included the Spanish counterpart of this description of claim procedures:

*Processing Procedures for Medical or Dental Claims*

1. All further citations to ERISA and COBRA provisions will take the form "Section —," referring to the Title 29 numbering rather than to either statute's internal numbering.

Any claim for Benefits under the Plan must be made in writing to the Benefit Trust Claims Department. If a claim for medical or dental benefits is denied in whole or in part, the Claim Department will notify you of the action being taken on the claim.

If a denial is necessary, such denial shall: (a) be in writing, in a manner intended to be understood by the average person, (b) contain the specific reason for denial of the claim; and (c) include an explanation of the claims review procedure.

*Appeal Procedures for Medical, Dental or Vision Claims*

1. If a claim for benefits is denied in whole or in part, you, or a representative you choose, may request a review of the decision within 60 days of the date you receive the notice of denial or limitation. A request for review must be in writing, addressed to the Benefits Administrator, c/o United Agricultural Employee Welfare Benefit Plan & Trust Claims, 54 Corporate Park, Irvine, CA 92714. You should state the reason you are requesting review, and include any additional information which might help the Administrator in evaluating your claim.

2. After the claim has been reviewed, if the denial is upheld, the Benefits Administrator will: (a) notify you in writing, (b) include a copy of the specific Plan provisions affecting the denial; and (c) let you know how to file an appeal.

3. If you disagree with the conclusions reached by the Benefits Administrator, you may file a written appeal within sixty (60) days of receipt of the results of that review. A written appeal should include: (a) your name, address and Social Security number, (b) the name of the patient, (c) the claim number and date of denial notice, (d) the specific facts upon which your appeal is being made; and (e) all documents you have supporting those facts.

Any appeal should be addressed to the Benefit Committee, c/o United Agricultural Employee Welfare Benefit Plan & Trust, 54 Corporate Park, Irvine, CA 92714.

Benefit Committee consideration will be based on your written statement, unless you request a formal hearing. If you request a hearing, it will be conducted at the offices of the Trust, upon 10 days written notice to all parties. Although not necessary, you may be represented by an attorney of your choice at the hearing.

The Benefit Committee will then conduct a full and fair evaluation of the appeal and shall base its decision on the information available at the time of consideration.

4. The Benefit Committee shall mail a written decision on the appeal to you within 30 days after receipt of the appeal. If there are special circumstances, such as a request to hold a hearing, the 30 day period will be extended to a maximum of 120 days. The Committee's final decision shall: (a) be written in a manner intended to be understood by the average person; (b) include the specific reason or reasons for the decision; and (c) contain a specific reference to the pertinent Plan provisions upon which the decision is based.

This direction (in Spanish) was on the final page of the Summary Plan Description:

*For assistance in filing a claim or for information, call or write:*

UNITED AGRICULTURAL
EMPLOYEE WELFARE
BENEFIT PLAN & TRUST
CLAIMS ADMINISTRATIVE OFFICE

54 Corporate Park
Irvine, California 92714
(714) 975–1424
(800) 223–4590

Although immediately before the switchover to the Plan Mario had not opted for family coverage, he asserts (and we credit for purposes of dealing with the Rule 56 ruling) that he elected such coverage under the Plan. Mario told Gregorio Perez (part of Associates' father and son managerial team) of that choice and relied on Gregorio to implement it.

After enrollment in the Plan was complete, Associated mailed its first monthly Group

Contribution Report ("Report") to the Plan along with a check for the month of June 1990. Mario was listed for single coverage, and his wife and children were never added to the June 1 enrollment card. Insurance premiums for family coverage, however, appear to have been deducted from Mario's paychecks by Associated in June and July.

Due to the seasonal nature of his work, Mario was laid off on July 6, 1990. Under the terms of the Plan his coverage expired on July 31, the last day of the month. Associated notified the Plan of Mario's termination by drawing a line through his name as it appeared on the August 10 Report. What happened next is in dispute. According to the Plan, in satisfaction of its COBRA obligations under Section 1166 it sent Mario a letter on August 30, 1990 notifying him in Spanish of his right to continue coverage at his own expense. As proof the Plan offers a document generated by its computer during this litigation that indicates an August 30 "Letter Creation Date." In addition, the Plan supplies an example of the type of letter that it says was mailed on that date. Mario testified during his deposition that he did not receive notification until October or November 1990, well past COBRA's 60–day election period under Section 1165. If true, that would violate Section 1166(c), which requires notification within 14 days of the Plan's receipt of Associated's August 10 Report. In any event the actual notification letter (if there ever was one) has disappeared.

Mario was rehired on August 28, 1990. There is no dispute that this time he elected family coverage. According to the terms of the Plan, however, Diazes were not eligible for coverage until Mario had worked at least 60 hours in a single month. That occurred in September 1990, causing coverage to kick in on October 1. Mario and his family were thus without coverage during the months of August and September 1990.

In September 1990 Diazes' daughter Julia was diagnosed with and began treatment for leukemia, leading to her death on May 2, 1991. But the Plan denied Mario's claim for Julia's medical expenses on the basis of the Plan's pre-existing condition limitation.[2] Although the text of each of the Plan's several denial letters sent during the spring and summer of 1991 was entirely in English, the back of each letter contained the following notice in both English and Spanish:

## APPEAL RIGHTS

If you believe your claim has not been paid correctly, you may send a written appeal within 60 days of the date of this notice. Any written appeal should include member's name and social security number, the claim number, the reason for your appeal and any other information you feel might help us in reviewing your claim. Appeal should be mailed to the address below:

Benefits Administrator
Tayson Insurance Administrators
54 Corporate Park
Irvine, CA 92714

Mario understood (indeed, he gleaned from the back of the letters) that his claim for Julia's expenses was being denied. Instead of following the directions for an appeal, however, he went to see Barbara Hartley ("Hartley"), Associated's on-site insurance representative. Hartley told Mario, "They're not going to pay." Mario asked, "What am I going to do?"—a question to which Hartley had no answer.

Mario never took any appeal in the manner explained in the Summary Plan Description and the Plan's denial-of-benefit letters. Instead on January 24, 1992 Diazes filed suit under Section 1132. On June 11, 1993 the

---

**2.** Included in the two-language Summary Plan Description that had been delivered to Mario was this definition, in both English and Spanish, of "pre-existing condition":

The term "pre-existing condition" refers to any illness which began, or accidental injury which happened, before the patient's effective date of coverage under the Plan. For benefit pur-

poses, the condition will be considered pre-existing if the patient incurred expense for diagnosis, or treatment of the condition or symptoms of the condition before diagnosis is established, including related complications, at any time prior to his or her effective date. Treatment includes medications, as well as medical care and/or diagnostic testing.

District Court granted both defendants' motions for summary judgment because the Diazes had failed to exhaust the Plan's internal administrative remedies. This appeal followed.

### Exhaustion Doctrine

■ Quite early in ERISA's history, we announced as the general rule governing ERISA claims that a claimant must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court. *Amato v. Bernard,* 618 F.2d 559, 566–68 (9th Cir.1980).[3] Although not explicitly set out in the statute, the exhaustion doctrine is consistent with ERISA's background, structure and legislative history and serves several important policy considerations, including the reduction of frivolous litigation, the promotion of consistent treatment of claims, the provision of a nonadversarial method of claims settlement, the minimization of costs of claim settlement and a proper reliance on administrative expertise. *Id.* at 566–68. "Consequently the federal courts have the authority to enforce the exhaustion requirement in suits under ERISA, and [ ] as a matter of sound policy they should usually do so." *Id.* at 568.

By not submitting a written appeal to the Benefits Administrator, Mario failed to comply with the Plan's internal review procedures and hence did not exhaust the available administrative remedies. Diazes urge (1) that exhaustion principles simply do not apply because Diazes advance a claim of statutory violation rather than one of Plan violation and (2) that even if exhaustion requirements do apply, Diazes' claim falls within each of two recognized exceptions to those requirements: inadequacy and futility. We consider those arguments seriatim.

■ Because the potential applicability vel non of exhaustion principles is a question of law, we consider it de novo. But if that question gets an affirmative answer, the District Court's decision not to grant an exception to the application of those principles is reviewed for abuse of discretion. *Amato,* 618 F.2d at 569.

### ERISA Violation v. Plan Violation

■ Diazes argue that because their action is premised on the Plan's failure to comply with the statutory requirements of Section 1166, Diazes were excused from seeking administrative review. To that end they point to *Amaro v. Continental Can Co.,* 724 F.2d 747, 750–53 (9th Cir.1984) and *Zipf v. American Telephone & Telegraph,* 799 F.2d 889, 891–94 (3rd Cir.1986) as purportedly standing for the proposition that ERISA's usual exhaustion requirements do not apply where a claimant's action is based on a statutory violation.

But that characterization seriously overstates the holdings in those cases. Both *Amato* and *Zipf* dealt with claimed violations of Section 1140, which prohibits interference with or discrimination against an employee's exercise or attainment of plan benefits. Neither case involved an individual's claim for plan benefits under a particularized set of facts—the kind of scenario that is presented here and that has led this and other Circuits to establish the claimant's need to go the administrative route first rather than turning directly to the courts.

Indeed, *Amaro,* 724 F.2d at 751 (footnote omitted) highlighted that very distinction, reconfirming the viability of *Amato* and its applicability to resolve cases such as the one before us:

> In *Amato* we enforced the exhaustion requirement in an action for a "declaration of the parties' rights and duties" under a pension plan. *Amato,* 618 F.2d at 561. Like *Challenger [v. Local Union No. 1,* 619 F.2d 645 (7th Cir.1980)], the pension plan in *Amato* contained the internal appeal procedure required by section 503. Our decision was based on the required section 503 administrative remedies and on the assistance the courts receive by "pension plan trustees *interpreting* their plans." [618 F.2d] at 568 (emphasis added).

**3.** *Amato* has become (and remains) an authority followed in other Circuits in announcing and

adhering to the same requirement.

Both *Challenger* and *Amato*, the cases relied on by *Kross [v. Western Elec. Co.*, 701 F.2d 1238 (7th Cir.1983) ], dealt with the rights of a party under a pension plan that falls within ERISA coverage. Both cases contained internal appeal procedures, congressionally mandated by section 503, that were designed to hear the claims presented in those cases. We are faced solely with an alleged violation of a protection afforded by ERISA. There is no internal appeal procedure either mandated or recommended by ERISA to hear these claims. Furthermore, there is only a statute to interpret. That is a task for the judiciary, not an arbitrator.

And *Zipf*, 799 F.2d at 891–92 pointed to precisely the same contrast after having reconfirmed the Third Circuit's own exhaustion doctrine (*Wolf v. National Shopmen*, 728 F.2d 182, 185 (3d Cir.1984)) that parallels our *Amato* requirement.

To be sure, many employee claims for plan benefits may implicate statutory requirements imposed by ERISA or COBRA (or perhaps other statutes, for that matter). And when the administrative resolution of those claims is then presented for judicial review, courts may then be called upon to determine whether the plan administrators have construed or dealt with those statutes in an appropriate manner. But that prospect does not give a claimant the license to attach a "statutory violation" sticker to his or her claim and then to use that label as an asserted justification for a total failure to pursue the congressionally mandated internal appeal procedures.

*Exceptions to the Exhaustion Requirement*

1. *Inadequacy of Remedy*

■ Diazes next contend that because the body of the denial letters was written in English, the Plan failed to alert them to the reason for the denials (the pre-existing condition limitation) in a language that they could comprehend. Their not knowing why their claims were being denied allegedly undercut

their ability to lodge an appeal, so that the internal review procedures were assertedly rendered "inadequate." Inadequacy of remedy is an exception to the exhaustion requirement. *Amato*, 618 F.2d at 568.

■ When Diazes' claims were denied they had in their possession the Spanish language version of the Summary Plan Description. As already indicated, that document outlined the appeals procedure and provided an address and two telephone numbers "[f]or assistance in filing a claim or for information." If the denial letters left Diazes in the dark (something that we will accept on this appeal), a toll-free telephone call could have shed light on the matter. Diazes fail to explain why that phone call was not made, nor have they suggested that the call would have been unproductive. Moreover, Diazes were informed in Spanish that their claims were being denied, that they had 60 days to file an appeal and that an appeal consisted of a written review followed (if necessary) by a hearing and subsequent evaluation by a committee. In sum, surely the District Court did not abuse its discretion in finding the Plan's internal appeal procedures adequate.

Diazes seek to avoid the consequence of that finding by arguing that ERISA's statutory and regulatory disclosure requirements obligated the Plan to notify them in Spanish of the reason for the denial. Diazes claim that because they could neither speak nor read English, the denial letters failed to furnish specific reasons for the denial "written in a manner calculated to be understood by the claimant," in asserted violation of Section 1133(1) and 29 C.F.R. § 2560.503–1(f).[4] And we recognize that if there were indeed a statutorily insufficient disclosure of a denial of plan benefits, even a carefully crafted internal appeals procedure (carefully crafted in purely procedural terms, that is) would be rendered inadequate.

But that aspect of Diazes' contention also fails to survive analysis. ERISA itself contains no express foreign language requirement, and ERISA's regulations contain only

4. Further citations to regulations in 29 C.F.R. will simply take the form "Reg. § —."

two limited foreign language mandates, the most relevant of which is found in Reg. § 2520.102–2(c) relating to summary plan descriptions. Importantly, the selfsame statutory language on which Diazes seek to rely— "written in a manner calculated to be understood by the participant"—is echoed both in the ERISA provision dealing with summary plan descriptions (Section 1022(a)(1)) and in the ERISA provision dealing with letters of denial (Section 1133(1)).[5]

What we have then are two essentially identical statutory requirements, both of which have been interpreted and elaborated on in regulations issued by the Secretary of Labor ("Secretary")—who is charged with the responsibility of administering the ERISA statute and promulgating regulations. And in only one of those instances has Secretary attached any requirement that under certain circumstances a document transmitted to plan participants must be in a foreign language. Both in that instance (Reg. § 2520.102–2(c), relating to summary plan descriptions) and in the only other regulation that imposes any foreign language requirement, that requirement is expressly limited to providing plan participants with offers of assistance [6]—in no instance has Secretary, after having given full consideration to the problems of workforces that are not English-language-literate, imposed any requirement that the operative document itself—either any summary plan description (Reg. § 2520.102–2(a) and (b)) or any summary annual report (Reg. § 2520.104b–10(d)) or any denial of benefits such as those involved in this case (Reg. § 2560.503–1(f))—must be

furnished to employees in their native tongues.[7]

If we were to accept Diazes' invitation to read Section 1133(1) as requiring the letters of denial at issue here to be written in Spanish, there would be no legitimate reason to construe the *identical* statutory language in Section 1022(a)(1) any differently. And again Secretary, after full deliberation, has *not* imposed any such requirement with respect to summary plan descriptions or claim denials. For us to read such a requirement into the statutes by judicial fiat where Secretary has not done so would do violence to the legitimate expectations of employers and plan administrators who have conformed their conduct to the existing regulations.

### 2. *Futility of Exhaustion*

 Finally, Diazes argue that it would have been "futile" for them to demand administrative review because both defendants have demonstrated by their continued refusal to pay that they have no intention of doing so. That argument is really circular, for defendants' current denial is pegged entirely to Diazes' failure to have pursued the administrative route. Moreover, such bare assertions of futility are insufficient to bring a claim within the futility exception, which is designed to avoid the need to pursue an administrative review that is demonstrably doomed to fail. *Amato,* 618 F.2d at 569; *Communications Workers of America v. AT & T,* 40 F.3d 426, 432–34 (D.C.Cir.1994); *Springer v. WalMart Assoc. Group Health Plan,* 908 F.2d 897, 901 (11th Cir.1990);

---

**5.** To be more precise, Section 1022(a)(1) speaks in terms of the summary plan descriptions having to be written in a manner calculated to be understood by the "average plan participant." In the present context that language variation is not material—in each instance the clear statutory purpose is to create an objective standard, a type of plain-language requirement in contrast to the often overly technical lawyerese that tends to be employed in the underlying plan documents themselves.

**6.** Reg. § 2520.104b–10(e) imposes an identical foreign language offer-of-assistance requirement

in connection with English-language summary annual reports provided to plan participants. That further buttresses the analysis in the text.

**7.** As already stated, in this instance the Plan went the extra mile by providing the entire 45–page Summary Plan Description, and not just an offer of assistance, in Spanish as well as English. We see no reason to treat either the Plan or Associated less favorably for having done more than Secretary's regulation requires.

*Drinkwater v. Metropolitan Life Ins. Co.,* 846 F.2d 821, 826 (1st Cir.1988). In this instance Diazes' own delinquency in pursuing an internal appeal prevented the possibility of an administrative look at the merits, and the record contains nothing but speculation to suggest that the administrators would have reached a preconceived result in that respect.[8]

### Conclusion

No error was involved in the District Court's application of the exhaustion doctrine to dismiss Diazes' claim, nor did that court abuse its discretion by refusing to recognize an exception to the exhaustion doctrine. We AFFIRM.

---

8. Diazes' Reply Brief attaches a letter from the Plan's Benefit Administrator rejecting an effort by Diazes' counsel to seek administrative review *after* the District Court had already granted summary judgment for the reasons dealt with here. That rejection, based as it was entirely on the outcome of the litigation between the parties, obviously gives no support to Diazes' futility argument.